## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| CEFO ENTERPRISE CORP., individually and on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FERRELLGAS, L.P.; FERRELLGAS PARTNERS, L.P.; AMERIGAS PROPANE, INC.; AMERIGAS PROPANE, L.P.; AMERIGAS PARTNERS, L.P.; and UGI CORPORATION,<br>Defendants. | Civil Action No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Cefo Enterprise Corp. ("Plaintiff") brings this antitrust class action on behalf of itself and all others similarly situated against Ferrellgas, L.P. and Ferrellgas Partners, L.P. ("Blue Rhino"); AmeriGas Propane, Inc., AmeriGas Propane, L.P., AmeriGas Partners, L.P., and UGI Corporation ("AmeriGas") (collectively "Defendants") for treble damages and other appropriate relief based on Defendants' unlawful conspiracy, from at least July 2008 to the present (the "Class Period"), to fix, raise, maintain, and stabilize the price of propane sold in exchangeable portable tanks by reducing their fill levels in violation of Section 1 of the Sherman Act.  Plaintiff brings suit under the Sherman Act, 15 U.S.C. §§ 1 & 15, seeking treble damages, costs and fees, and injunctive and other equitable relief as the Court deems appropriate.

Based upon its personal knowledge as to its own conduct, and upon the investigation of counsel and information and belief, Plaintiff alleges:

## I.   INTRODUCTION

1.     Plaintiff Cefo Enterprise Corp. runs a hardware store in Middleburg Heights, Ohio. During the Class Period it purchased propane in exchangeable portable tanks, commonly called "propane exchange tanks." Propane exchange tanks are used by end-users primarily to fuel outdoor grills, patio heaters, mosquito magnets, and other equipment.

2.     During the relevant period, Plaintiff purchased propane in propane exchange tanks from one or more of the Defendants. Because of Defendants' unlawful conspiracy as alleged in this Complaint, Plaintiff paid artificially inflated and fixed prices for propane in exchange tanks and suffered antitrust injury as a result.

3.     Blue Rhino and AmeriGas are the two largest distributors of propane in exchange tanks in the United States, and together they control 80% of the U.S. market. As alleged herein, Blue Rhino and AmeriGas (and their subsidiaries and affiliates named herein) conspired to fix the price of propane sold by agreeing to reduce the amount of propane in propane exchange tanks, thereby raising the per-pound price of propane across the country.

4.     Defendants sell propane in exchange tanks directly to customers such as Plaintiff across the United States, including hardware stores, gas stations, convenience stores, grocery stores, and other retailers ("the Class"). Retailers typically sell propane in filled exchange tanks to their customers, and when the tank is depleted, the customer typically returns it to a retailer and exchanges it for a filled tank. The retailer sends the empty tanks to Defendants or other suppliers, who refill them with propane, refurbish or replace the tanks as needed, and send filled tanks to the retailer.

5.     Until 2008, Blue Rhino and AmeriGas both filled their propane exchange tanks with 17 pounds of propane. In 2008, Blue Rhino and AmeriGas conspired to reduce the fill level to 15 pounds, thereby effectively raising the price of propane sold in propane exchange tanks.

By conspiring to decrease the fill from 17 pounds to 15 pounds, Defendants were able to maintain the same price per "full" tank, and thus increased their margins on the sale of propane exchange tanks.

6.  Blue Rhino and AmeriGas each knew that by itself, neither one could force such a change on all retailers if the other one presented a more competitive, 17-pound option at the existing price. They therefore engaged in dozens of calls, emails, and in-person meetings with each other to implement a unified front that would leave their customers with no choice but to accept their reduced fill level.

7.  To effectuate their conspiracy, Defendants targeted their large customers, knowing that once they were forced to accept the reduced fill, all purchasers would have no choice but to accept this *de facto* agreed-upon price hike. Blue Rhino targeted, among others, Lowe's Companies, Inc. ("Lowe's"), a chain of home improvement stores. Both Defendants targeted Wal-Mart Stores, Inc. ("Walmart"), a customer of each, and through their collusion and unified stance forced it to accept the fill reduction. This helped ensure Defendants' ability to enforce the fill level reduction throughout the market.

8.  Their concerted action had the purpose and effect of raising the prices at which Blue Rhino and AmeriGas sold propane in propane exchange tanks to Plaintiff and other retailers throughout the United States.

9.  Defendants' collusion rendered them largely immune to market forces which, in a competitive market, would have countered an effort by an individual supplier to increase prices and reduce fill levels. Defendants' conduct constitutes a violation of United States antitrust laws, and direct purchasers of propane in exchange tanks, including Plaintiff and the Class, have paid

more than they would have paid in a competitive market, and have suffered antitrust injury as a result.

10.     On March 27, 2014, the Federal Trade Commission ("FTC") issued a complaint against Blue Rhino and AmeriGas, alleging violations of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. As the FTC concluded, Defendants' "conduct has restrained price competition and led to higher prices for sales of propane exchange tanks in the United States."

## II.     PARTIES

11.     Plaintiff Cefo Enterprise Corp. is an Ohio corporation with its principal place of business in Middleburg Heights, Ohio, and runs a hardware store under the trade name ACE Hardware Middleburg Heights. During the Class Period, Cefo Enterprise purchased propane in exchange tanks from one or more of the Defendants, paid inflated per-pound prices due to Defendants' unlawful conspiracy, and has suffered antitrust injury as a result.

12.     Defendant Ferrellgas Partners, L.P., is a Delaware limited partnership with its principal place of business at 7500 College Boulevard, Overland Park, Kansas. It maintains a nearly complete interest in and conducts its business activities primarily through Defendant Ferrellgas, L.P. Ferrellgas Partners, L.P., including through its subsidiaries and affiliates, participated in the conspiracy alleged in this Complaint and marketed and/or sold propane in exchange tanks throughout the United States, including in this District, during the Class Period.

13.     Defendant Ferrellgas, L.P., is a Delaware limited partnership with its principal place of business at 7500 College Boulevard, Overland Park, Kansas. Ferrellgas, L.P., doing business as Blue Rhino, operates a national propane distribution business, and owns or has access to distribution locations nationwide. Its business includes the filling, refilling, refurbishing, sale and distribution of propane exchange tanks under the Blue Rhino trade name.

Blue Rhino's propane is sold to consumers at more than 43,000 retail locations nationwide through its exchange tank service. Ferrellgas, L.P., including through its subsidiaries and affiliates, participated in the conspiracy alleged in this Complaint and marketed and/or sold propane in exchange tanks throughout the United States, including in this District, during the Class Period.

14.     Defendants Ferrellgas Partners, L.P. and Ferrellgas, L.P. are collectively referred to in this Complaint as Blue Rhino or the Blue Rhino Defendants.

15.     Defendant UGI Corporation is a Pennsylvania corporation with its office and principal place of business at 460 North Gulph Road, King of Prussia, Pennsylvania. UGI Corporation is the parent and sole owner of Defendant AmeriGas Propane, Inc. UGI Corporation, including through its subsidiaries and affiliates, participated in the conspiracy alleged in this Complaint and marketed and/or sold propane in exchange tanks throughout the United States, including in this District, during the Class Period.

16.     Defendant AmeriGas Propane, Inc. is the general partner of Defendant AmeriGas Partners, L.P., and is a Pennsylvania corporation with its principal place of business at 460 North Gulph Road, King of Prussia, Pennsylvania. AmeriGas Propane, Inc., including through its subsidiaries and affiliates, participated in the conspiracy alleged in this Complaint and marketed and/or sold propane in exchange tanks throughout the United States, including in this District, during the Class Period.

17.     Defendant AmeriGas Partners L.P. is a publicly traded, Delaware master limited partnership with its principal place of business at 460 North Gulph Road, King of Prussia, Pennsylvania. AmeriGas Partners, L.P., operates a national propane distribution business through its subsidiary, Defendant AmeriGas Propane, L.P. AmeriGas Partners, L.P., including through

its subsidiaries and affiliates, participated in the conspiracy alleged in this Complaint and marketed and/or sold propane in exchange tanks throughout the United States, including in this District, during the Class Period.

18.     Defendant AmeriGas Propane, L.P., is a Delaware limited partnership and subsidiary of Defendant AmeriGas Partners L.P. with its principal place of business at 460 North Gulph Road, King of Prussia, Pennsylvania. AmeriGas Propane, L.P. operates a web-based publication named AmeriGas Cylinder Exchange for preparing, distributing, marketing, or selling propane in propane exchange tanks.[1] AmeriGas Propane, L.P., including through its subsidiaries and affiliates, participated in the conspiracy alleged in this Complaint and marketed and/or sold propane exchange tanks that were purchased throughout the United States, including in this District, during the Class Period.

19.     Defendants UGI Corporation, AmeriGas Propane, Inc., AmeriGas Partners, L.P., and AmeriGas Propane, L.P., are collectively referred to in this Complaint as AmeriGas or the AmeriGas Defendants.

### III.     JURISDICTION AND VENUE

20.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 6 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

21.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4, 15, and 26, and 28 U.S.C. §§ 1331 and 1337.

22.     This Court has personal jurisdiction over Defendants.     Blue Rhino is headquartered in Overland Park, Kansas. In addition, during the Class Period both Blue Rhino and AmeriGas knowingly transacted substantial business in this judicial district by selling

---

[1] *E.g.*, http://blog.amerigas.com/amerigas-cylinder-exchange/a-new-look-for-amerigas-propane-exchange/ (last visited July 16, 2014).

propane in exchange tanks and also transacting business with each other in this district, including in furtherance of the unlawful conspiracy alleged herein. It is this conduct from which the claims of Plaintiffs and the Class arises.

23.     Venue is proper in this district under 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b)(1)-(2), (c), and (d) because, during the Class Period, Defendants had a principal place of business, resided, transacted business, were found, and/or had agents in this District, conducted business in this judicial district, and because a substantial part of the acts or omissions giving rise to the claims set forth herein occurred in this district.

## IV.     THE STRUCTURE OF THE PROPANE EXCHANGE TANK MARKET FACILITATED DEFENDANTS' CONSPIRACY AND RENDERS PLAINTIFFS' ALLEGATIONS ECONOMICALLY PLAUSIBLE.

24.     In addition to the many acts which Defendants took in furtherance of their conspiracy – specifically alleged in Section V below – the structure of the market for propane sold in exchange tanks in the United States and other facts are conducive to a price-fixing agreement, and made collusion particularly attractive to Defendants. These include: (1) propane sold in exchange tanks is a homogeneous, standardized product, interchangeable across producers, with a nationwide market; (2) Defendants together control 80% of the relevant market; (3) there are no reasonable substitutes that would constrain pricing; (4) the federal government has initiated an investigation into Defendants' anticompetitive conduct; (5) high barriers to entry prevent new entrants from constraining prices; and (6) Defendants have "co-packing" agreements with each other which facilitate their conspiracy.

### The Product Is Homogeneous and Standardized With a Nationwide Market.

25.     The relevant product market is the wholesale market for the sale of propane in propane exchange tanks. Propane is a clean-burning, colorless gas. Propane exchange tanks are

commonly used to operate gas grills, patio heaters, outdoor fireplaces, mosquito traps, and other outdoor equipment.

26.     The relevant geographic market is the United States. Regardless of where the propane itself is produced, it can be and is distributed nationwide due to the relative ease of transportation.

27.     Propane sold in propane exchange tanks is a homogeneous, standardized product, and is interchangeable across producers, including Blue Rhino and AmeriGas. Similarly, a propane exchange tank consists of a standardized tank and a standardized valve system. Defendants treat their propane sold in exchange tanks as interchangeable.  Consumers can exchange any propane exchange tank at any store that carries propane exchange tanks without regard for which company initially supplied the tank.[2]

28.     The following illustrations demonstrate the similarity and interchangeability of Defendants' propane exchange tanks:

---

[2] *E.g.*, http://www.bluerhino.com/Tank-Exchange/About-Tank-Exchange.aspx (last visited July 16, 2014) ("Drop any standard propane grill cylinder by the storefront tank display.").





29.     Propane exchange tanks are manufactured and sold in a standard size with a maximum capacity of 25 pounds. However, the maximum practical capacity is less. For safety reasons, propane exchange tanks cannot be filled to more than 80 percent capacity. Additionally, as of 2002 the National Fire Protection Association required use of an overfilling protection device ("OPD"), reducing the available capacity to approximately 17.5 pounds. In practice, therefore, all propane exchange tanks have a standard maximum capacity of between 17 and 17.5 pounds.

30.     Retailers such as Plaintiff and members of the Class (*e.g.,* hardware stores, home improvement stores, mass merchandisers, supermarkets, convenience stores and gas stations) typically sell propane to consumers in propane exchange tanks. At their option, purchasers may: (a) purchase a prefilled propane exchange tank in exchange for an empty tank; or (b) purchase a prefilled propane exchange tank for a higher price, without returning an empty tank.

31.     After receiving empty tanks from Plaintiff and members of the Class, Defendants

bring the empty tanks to refurbishing and refilling facilities, where they prepare and refill the

tanks to be redistributed to Plaintiff and other direct purchasers. As discussed below, pursuant to

co-packing agreements entered into by Defendants, Defendants refurbish and refill each other's

tanks. This fact among others demonstrates that Defendants' propane exchange tanks are

fungible, and that one producer's propane exchange tank is viewed as substitutable for that of

another.

32.     The FTC has identified the wholesale marketing and sale of propane exchange

tanks as a product market with a national geographic scope. See Compl., *In re Ferrellgas*

*Partners, L.P.,* No. 9360, 2014 WL 1396496, ¶¶ 26-29 (Mar. 27, 2014).

**Defendants Together Control 80 Percent of the Market.**

33.     At all times relevant to this Complaint, Blue Rhino and AmeriGas were the two

largest suppliers of propane sold in exchange tanks in the United States. Blue Rhino controlled

approximately 50 percent of the national wholesale market for propane in exchange tanks, while

AmeriGas controlled approximately 30 percent. No other competitor controlled more than nine

percent of this market. Defendants' domination of the relevant market allowed them to dictate

and lower the standard amount of propane in exchange tanks without fear of competition.  Thus,

Defendants' control of the relevant market provided them the opportunity and means to adopt

and implement their conspiracy and anti-competitive agreements alleged herein.

**No Reasonable Substitutes Exist to Constrain Pricing.**

34.     There are no reasonable substitutes for propane sold in exchange tanks that

provide a similar ease of use and that have gained the widespread consumer acceptance of

propane sold in exchange tanks.  No other product significantly constrains the prices of propane sold in exchange tanks.

35.     Prior to the introduction of propane exchange tanks, the only option for a consumer who needed to purchase propane was to purchase an empty cylinder and bring it to a filling location. In the later 1990s, Defendants began providing exchange tanks, allowing consumers to exchange their empty cylinders for prefilled tanks. Propane exchange tanks quickly became popular due to the convenience and safety benefits for retailers in dispensing with large on-site propane tanks, as well as the convenience to consumers of exchanging propane tanks rather than refilling an old cylinder. The use of direct consumer refilling has thus declined over the past ten years, such that any remaining direct consumer refilling does not constrain the price of propane exchange tanks.

### The Federal Trade Commission Has Investigated Defendants' Anticompetitive Conduct and Filed a Complaint.

36.     On March 27, 2014, the Federal Trade Commission ("FTC") issued a complaint against Blue Rhino and AmeriGas, alleging violations of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Like this Complaint, the FTC complaint arose from Defendants' agreements and practice of lowering the amount of propane in propane exchange tanks from 17 pounds to 15 pounds. As the FTC concluded, Defendants' "conduct has restrained price competition and led to higher prices for sales of propane exchange tanks in the United States."

### High Barriers to Market Entry or Expansion Preclude New Entrants From Constraining Pricing

37.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. However, when there are significant barriers to entry, new entrants are

less likely. Thus, barriers to entry facilitate the formation and maintenance of a cartel such as is alleged in this Complaint.

38.     There are significant barriers to entry into the market for propane sold in exchange tanks. As alleged in this Complaint, Blue Rhino and AmeriGas together control 80% of the market in the United States.  Because of the widely distributed demand, sellers of propane and propane exchange tanks must have national reach and nationally distributed refilling facilities to compete effectively. To serve retail outlets that sell propane in exchange tanks, a seller also needs access to refurbishing and refilling facilities, where empty tanks can be cleaned, refurbished, repainted, and refilled.

39.     As Blue Rhino stated in its 2013 Form 10-K, there are "few propane distributors that can competitively serve commercial and portable tank exchange customers on a nationwide basis. . . .  [I]nvestments in technology similar to ours require both a large scale and a national presence, in order to generate sustainable operational savings to produce a sufficient return on investment."

40.     Thus, other existing suppliers of propane in exchange tanks who, unlike Defendants, lack a "large scale and a national presence" are unable to significantly constrain the prices of propane sold in exchange tanks.  A new entrant would confront even higher barriers, including expensive and lengthy start-up costs, costs associated with sourcing and transporting bulk propane, meeting safety and environmental regulations, manufacturing plants and equipment, energy, transportation distribution infrastructure, skilled labor, long-standing customer relationships, and safety and quality assurance.

## Defendants Have "Co-Packing" Agreements
## With Each Other Which Facilitate Their Conspiracy.

41.     Beginning around 2006, Defendants entered into a series of "co-packing agreements," pursuant to which each Defendant agreed to refurbish and refill propane exchange tanks for the other at certain of each company's facilities. Today, each Defendant processes slightly less than ten percent of the other Defendant's used, empty tanks pursuant to co-packing agreements. Blue Rhino refurbishes and refills exchange tanks for AmeriGas at Blue Rhino facilities in Florida, Colorado, Washington and Missouri. AmeriGas refurbishes and refills exchange tanks for Blue Rhino at AmeriGas facilities in California and New Hampshire.

42.     These co-packing agreements (among other methods) provided an opportunity for Defendants to exchange competitively sensitive information.  As alleged below, Defendants took advantage of such opportunities, including at least one in-person meeting on May 23, 2008 ostensibly held to discuss co-packing, but in fact used to further Defendants' conspiracy.  These and other exchanges between Defendants had the purpose, tendency, and effect of facilitating their conspiracy.

## V.     DEFENDANTS ACTED AFFIRMATIVELY TO
## ESTABLISH AND IMPLEMENT THEIR ANTICOMPETITIVE AGREEMENT.

43.     Prior to the conspiracy, most if not all suppliers of propane exchange tanks, including Defendants, filled their tanks at a standard 17 pounds.

44.     In early 2008, there was an increase in input costs for propane sold in exchange tanks. These inputs included propane, steel for the propane tanks, and diesel fuel for delivery trucks.

45.     In early 2008, Blue Rhino and AmeriGas both considered decreasing the fill level in their propane exchange tanks below the standard 17-pound fill to improve profitability.  Each one knew, however, that it could not successfully do so if the other did not follow.

46.     In 2007 and 2008, AmeriGas foresaw "only modest growth in total demand" for propane, according to its Form 10-Ks.  Thus, when it considered decreasing fill levels without decreasing per-tank prices in January 2008, AmeriGas recognized the very real risk that its major competitor (*i.e.*, Blue Rhino) would take significant business from it by maintaining their pre-existing fill levels at pre-existing prices. Accordingly, AmeriGas concluded that it could not implement a fill reduction at that time.

47.     In April 2008, Blue Rhino similarly considered a proposal to reduce its fill level from 17 pounds to 15 pounds, without a corresponding price reduction. The Blue Rhino proposal included a plan to inform AmeriGas in advance of the proposed fill reduction. But like AmeriGas, Blue Rhino recognized that such a move would be disastrous if it was the only supplier to make the change.

48.     Blue Rhino was particularly concerned that changing its prices or fill levels unilaterally would put it at a competitive disadvantage at Walmart, its second-largest customer. At the time, Walmart was the largest retailer of propane exchange tanks in the United States, and spread its propane tank business among multiple suppliers to foster competition and resist price increases. Blue Rhino supplied approximately 60 percent of Walmart locations, while AmeriGas supplied the other 35 percent. Ozark Mountain Propane Company ("Ozark"), a small regional supplier in Garfield, AR, supplied the remaining five percent.

49.     As the Blue Rhino Director of Strategic Accounts responsible for Walmart reported to his manager: "[I]n my mind the 'watch out' is the competitive difference between [Blue Rhino, AmeriGas] and Ozark. We are offering less product vs. [Walmart's] other 2 suppliers. . . . Once we explain this is a done deal (and that we are not asking for [Walmart's] input or letting him decide), he may become resentful and threaten to take states. . . . Then, we

need to pray that [AmeriGas] takes a similar move as soon as possible. If [AmeriGas] doesn't move, we will have a BIG issue." He elaborated: "The only thing that can make this go away is if AmeriGas goes to 15 as well, but it has to happen very soon after us to legitimize our move." Blue Rhino thus acknowledged that it was the cooperation of AmeriGas, its largest competitor, that was required to successfully implement a fill level reduction.

50.     Blue Rhino's need to collude with AmeriGas for this price increase to succeed was even clearer after Blue Rhino broached the fill reduction with Walmart in April 2008.

51.     Around April 28, 2008, Blue Rhino's Director of Strategic Accounts informed a Walmart buyer that Blue Rhino intended to reduce its fill level. Walmart rightly understood the proposed fill reduction to be a price increase and refused to agree. Walmart also said that it did not want to carry propane exchange tanks with different fill levels and wanted fill levels to remain standard, implying that it might shift all business to AmeriGas and Ozark if forced to choose between 17-pound and 15-pound tanks.

52.     Around April 29, 2008, a senior Blue Rhino manager ordered its production managers to "stand down" on implementation of the fill reduction because "[t]he call with Walmart did not go according to plan."

53.     After this initial rejection, Blue Rhino began several months of communication and coordination to get AmeriGas to join its effort to force a fill reduction on Walmart and other retailers.

54.     Around May 23, 2008, Blue Rhino's Vice President of Operations, Jay Werner, met with an AmeriGas vice president responsible for the propane exchange tank business, ostensibly to discuss their co-packing arrangement. But as AmeriGas's notes of the meeting reveal, Defendants used their co-packing agreement to further their anticompetitive goals.

Among the topics they discussed at their meeting were: (a) Blue Rhino's plan (not yet agreed to by any retailer) to reduce its fill level from 17 to 15 pounds; (b) Blue Rhino's desire to exclude Heritage Propane, a small maverick competitor, from access to refilling facilities that a third party was considering building; and (c) each Defendant's costs of refilling at various facilities.

55.     On May 29, 2008, Blue Rhino proposed the fill reduction to Lowe's, who was Blue Rhino's largest retail customer. Approximately two weeks later, Lowe's accepted the proposal, but only on the condition that Blue Rhino convert all of its other customers, including Walmart, to 15-pound tanks within 30 days of implementing the fill reduction at Lowe's.

56.     From June 18 to June 19, 2008, Blue Rhino's President, Tod Brown, exchanged seven phone calls with AmeriGas's Director of National Accounts. During that time, AmeriGas indicated to Blue Rhino that it would follow closely behind Blue Rhino if it successfully implemented its fill reduction, and that it would not sell both 15-pound and 17-pound tanks.

57.     The next day, June 20, 2008, AmeriGas produced a draft budget incorporating a fill reduction from 17 to 15 pounds.

58.     On June 25, 2008, Blue Rhino's President Brown again spoke with an AmeriGas executive (this time, AmeriGas's President of Sales and Marketing) about the fill reduction. That same day, Blue Rhino began informing its customers that it planned to reduce the fill level in its propane exchange tanks as of July 21, 2008.

59.     The next day, Blue Rhino's Werner again spoke with an AmeriGas employee about the fill reduction, discussing (among other things) the timing for rolling out the fill reduction to each company's customers.

60.     No later than the last week of June 2008, Blue Rhino and AmeriGas had agreed on both the fill reduction and a rollout plan. Blue Rhino would begin selling 15-pound tanks on July 21, 2008, and AmeriGas would follow on August 1, 2008.

61.     When AmeriGas announced the reduction to its employees on July 15, 2008, it suggested that it knew Blue Rhino would do the same. AmeriGas explained: "In an attempt to offset some of these expenses, achieve desired product margins, and maintain retail prices at an attractive level for consumers, AmeriGas Cylinder Exchange *and other national providers* are transitioning to a 15 pound cylinder. This slight decrease from current 17 pound levels will quickly become *the industry standard . . . .*" (Emphasis added.)

62.     Similarly, AmeriGas told its production team that "[t]he major competitors in cylinder exchange will also be moving to a 15 pound cylinder and as a result, it will become the industry standard." The only "major competitor[]" AmeriGas was referring to was its coconspirator Blue Rhino—but as AmeriGas knew, given their control of 80% of the market for propane exchange tanks, the two of them acting together would be sufficient to move most if not all of the industry to the 15-pound standard.

63.     Having reached their agreement, Defendants implemented their *de facto* price increase to the Class, starting with their major customers.

64.     From July 2008 through October 2008, sales executives from the two Defendants communicated repeatedly with each other by telephone and email to discuss their progress with Walmart and other customers and to maintain their joint commitment to their scheme to reduce fill levels.

65.     Thus, when AmeriGas told Walmart of its intention to reduce its fill levels, it could confidently tell Walmart that it faced a new "industry standard" and not just a solo effort

by AmeriGas. For example, on July 10, 2008, AmeriGas's Director of National Accounts emailed Walmart's buyer to inform him that "the *cylinder exchange industry* is planning a move to a standard weight of propane in a tank from 17 lbs. net to 15 lbs. net." (Emphasis added.)

66.    Walmart initially rejected AmeriGas's proposal, as it had Blue Rhino's. Therefore, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts discussed Walmart's position at length, including during phone calls on July 10, 21, and 22, 2008, and discussed AmeriGas's plans to overcome Walmart's rejection of the fill reduction.

67.    Around August 11, 2008, AmeriGas's Director of National Accounts called his ostensible competitor, Blue Rhino's Vice President of Sales, to inform him that he was having trouble getting in touch with Walmart to discuss the reduction in fill levels.

68.    Blue Rhino strategized internally as to how AmeriGas could make headway with Walmart. Around August 13, 2008, Blue Rhino sales executives responsible for Walmart discussed the possibility of advising AmeriGas to ensure that other customers, such as Home Depot, AmeriGas's largest retail customer, were visibly supplied with the reduced 15-pound tanks, because Walmart would be more likely to accept the fill reduction if it knew that Home Depot had already accepted it.

69.    On August 21, 2008, Blue Rhino and AmeriGas sales executives spoke several times by telephone. Shortly after these communications, the AmeriGas sales executive and AmeriGas's operations manager directed their colleagues to do exactly what Blue Rhino had discussed internally: ensure that the Home Depot store in Rogers, Arkansas (near Walmart's Bentonville headquarters) carried only 15-pound tanks.

70.    On September 2, 2008, Blue Rhino's Vice President of Sales and AmeriGas Director of National Accounts spoke again by telephone. Discussions included their respective

efforts to convert their various customers to 15-pound tanks, and the current retail pricing of tanks at Lowe's.

71.    On September 12, 2008, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts spoke again by phone to discuss their negotiations with Walmart. AmeriGas's Director of National Accounts suggested issuing an ultimatum to Walmart, to which Blue Rhino's Vice President of Sales responded by encouraging AmeriGas to "hang in there."

72.    Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts spoke by telephone at least twice more over the next two weeks.

73.    On September 30, 2008, AmeriGas's Director of National Accounts emailed Blue Rhino's Vice President of Sales to inform him that Walmart management planned to discuss the proposed fill reduction the following day.

74.    As October 2008 began, however, Walmart had still not agreed to Defendants' demands. On October 6, Lowe's reminded Blue Rhino that it had agreed to accept 15-pound tanks on the condition that all other Blue Rhino customers would be converted within 30 days. Lowe's observed that Walmart was still selling 17-pound tanks, putting Lowe's at a competitive disadvantage. Lowe's demanded that Blue Rhino either move all of its customers to 15-pound tanks or convert Lowe's back to 17-pound tanks at the same price it was paying for the 15-pound tanks.

75.    Defendants knew they could not let their implementation of the fill level reduction on all customers unravel.  Pressured by Lowe's demand, Blue Rhino's President forwarded the Lowe's email to his Vice President of Sales and directed him to obtain Walmart's acceptance of the fill reduction that day. Blue Rhino's Vice President of Sales immediately took action —by calling AmeriGas's Director of National Accounts and speaking to him for 16 minutes.

76.     After hanging up with the AmeriGas Director of National Accounts, Blue Rhino's Vice President of Sales emailed Walmart and demanded that it accept the fill reduction.

77.     Early the next morning, the AmeriGas Director of National Accounts emailed Walmart in similar language, urging it to accept the fill reduction.

78.     On October 10, 2008, presented with identical demands from its only two national propane exchange tank suppliers, Walmart capitulated and accepted the fill reduction from both Blue Rhino and AmeriGas.

79.     Therefore, due to their coordinated action and mutually reinforced resolve, Defendants were able to change the industry standard to 15-pound tanks, thereby imposing a *de facto* and agreed-upon price increase on all customers. Since 2008 Defendants have continued to abide by and maintained their agreements to fill propane exchange tanks with 15 pounds of propane.

80.     Defendants' conspiracy had the purpose and effect of restraining competition, limiting supply, and increasing prices for filled propane exchange tanks. Defendants have continued the reduced fill levels despite the fact that propane prices have decreased substantially from their 2008 high.

## VI.     DEFENDANTS' CONSPIRACY CAUSED ANTITRUST INJURY TO PLAINTIFF AND CLASS MEMBERS.

81.     Defendants' conspiracy had the following effects, among others:

   a.     Price competition has been restrained or eliminated with respect to propane sold in exchange tanks;

   b.     The price of propane sold in exchange tanks has been fixed, raised, stabilized, or maintained at artificially inflated levels; and

      c.     Purchasers of propane sold in exchange tanks have been deprived of free and open competition.

82.     During the Class Period, Plaintiff and Class members purchased propane in exchange tanks directly from Defendants, and in doing so paid supracompetitive prices as a result of the wrongful conduct alleged in this Complaint.

83.     By reason of Defendants' wrongful conduct and violations of the antitrust laws, Plaintiffs and the members of the Class have incurred damages and suffered injury to their businesses or property, by paying higher prices for propane in exchange tanks than they would have paid but for Defendants' wrongful conduct. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.   A CLASS ACTION IS APPROPRIATE IN THIS MATTER.

84.     Plaintiff sues on its own behalf and pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following class (the "Class"):

> All individuals and entities in the United States who, between July 21, 2008 and the present (the "Class Period"), directly purchased propane in propane exchange tanks from one or more Defendants, their subsidiaries or affiliates.

85.     Excluded from the proposed Class are Defendants, their affiliates, subsidiaries, and parents, and any entity in which Defendants have a controlling interest, Defendants' legal representatives, predecessors, successors, assigns, and employees, and any governmental entity.

86.     Plaintiff is a member of the Class it seeks to represent. Members of the Class can be identified using Defendants' records or, absent that, through self-identification in a claims process. Class members can be notified of the class action through internet postings, publication, direct mail and other posted notices.

87.     The members of the Class are so numerous that individual joinder of all members is impracticable.  Blue Rhino's propane exchange tanks are available at "tens of thousands of convenient locations nationwide," and AmeriGas's tanks are available at "over 48,000 locations nationwide."[3]  Given the size and nationwide scope of Defendants' business, the number of Class members clearly exceeds the number that would make joinder practicable, and Class members are so geographically diverse that joinder of all Class members is impracticable.

88.     Plaintiff's claims are typical of the claims of other Class members, as they arise out of the same course of conduct by Defendants.  Plaintiff's interests are aligned with, and not antagonistic to, those interests of the other members of the Class. Accordingly, by proving Plaintiff's own claims, Plaintiff will prove other Class members' claims as well.

89.     Plaintiff and its counsel can and will fairly and adequately protect the interests of the Class. Plaintiff will vigorously pursue the claims, has no antagonistic conflicts, and has retained able and experienced class action litigators as counsel.

90.     There are common questions of law and fact specific to the Class, including:

a.      Whether Blue Rhino and AmeriGas unlawfully combined and conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act as alleged in this Complaint;

b.      The identity of the participants in the conspiracy;

c.      The duration of the conspiracy;

d.      The acts carried out by Defendants and any co-conspirators in furtherance of the conspiracy;

---

[3] "Where to Get Blue Rhino," http://www.bluerhino.com/Tank-Exchange/Find-a-Rhino-Location.aspx (last visited July 16, 2014); AmeriGas Propane Exchange Location Finder, http://www.amerigas.com/exchange/consumer/ (last visited July 16, 2014).

e.     Whether the alleged conspiracy violated the Sherman Act;

f.     Whether Defendants' conduct, as alleged in this Complaint, caused injury to the business or property of Plaintiff and members of the Class;

g.     The effect of the conspiracy on prices for propane exchange tanks sold in the United States during the Class Period;

h.     Whether Defendants concealed their conduct from Plaintiff and members of the Class;

i.     The appropriate class-wide measure of damages; and

j.     The appropriate injunctive and other equitable relief for the Class.

91.     These and other common questions of law or fact predominate over any questions affecting only individual members.

92.     A class action is a superior method for the fair and efficient adjudication of the controversy.  Among other things, a class action will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The Class is readily definable. By contrast, separate actions by individual Class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of class members to pursue their claims. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## VIII.   THE RUNNING OF THE STATUTE
## OF LIMITATIONS HAS BEEN TOLLED.

93.     Until recently, Plaintiff and the Class did not know and through the exercise of reasonable diligence could not have known of the anticompetitive conduct alleged herein. As alleged in this Complaint, Defendants conducted their conspiracy in non-public and confidential email exchanges and telephone calls. Defendants actively misled Plaintiff and the Class into believing that each had unilaterally decided to decrease the fill level of its propane exchange tanks, and gave Class members pretextual reasons for the reduction, citing technical complications with the fill level. Defendants concealed from Plaintiff and the Class their secret phone, email and in-person conversations in which they (1) jointly agreed to decrease the fill level, and (2) jointly agreed not to deviate from their plan to decrease the fill level, despite any customer resistance. Defendants also concealed the fact that they secretly and repeatedly verified with each other that each was adhering to their agreement to stand firm against any customer resistance to their fill reduction.

94.     Accordingly, the statute of limitations presents no bar to any portion of the damage claims asserted by Plaintiff or the Class.

## IX.    CLAIMS FOR RELIEF
## COUNT 1: VIOLATION OF SECTION 1 OF THE SHERMAN ACT

95.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

96.     Defendants distribute, sell, ship, and refill propane in exchange tanks nationwide and across state lines, such that the conduct alleged herein affected interstate commerce.

97.     Defendants and their co-conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

98.     Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

99.     At least as early as July 21, 2008, and continuing until such time as the anticompetitive effects of Defendants' conduct shall cease, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for propane sold in exchange tanks as alleged in this Complaint, thereby creating anticompetitive effects.

100.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for propane sold in exchange tanks.

101.    As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for propane sold in exchange tanks.

102.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.

103.    Defendants' conspiracy had the following effects, among others:

      a.    Price competition in the market for propane sold in exchange tanks has been restrained, suppressed, and/or eliminated in the United States;

      b.    Prices for propane sold in exchange tanks sold by Defendants, their divisions, subsidiaries, and affiliates, and their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

      c.    Plaintiffs and members of the Class who purchased propane in exchange tanks from Defendants, their divisions, subsidiaries, and affiliates, and any co-conspirators have been deprived of the benefits of free and open competition.

104.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for propane in exchange tanks than they would have paid and will pay in the absence of the conspiracy.

105.    Defendants' combination, or conspiracy is a *per se* violation of the federal antitrust laws.

106.    Defendants' conduct is continuing and has caused antitrust injury to Plaintiff and the Class through the present, and will continue to do so unless equitable relief is granted.

107.     The equitable relief requested by Plaintiff below is necessary to deter future antitrust violations, redress Plaintiff's and class members' injuries, and restore competition to the market for propane in exchange tanks.

## X.     REQUEST FOR RELIEF

WHEREFORE, Plaintiff individually and on behalf of the Class, as applicable, request judgment against Defendants as follows:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

B.     The Court adjudge and decree that Defendants' unlawful conduct, conspiracy or combination alleged herein is an unreasonable restraint of trade or commerce and a *per se* violation of Section 1 of the Sherman Act;

C.     Plaintiffs and the Class recover damages, to the maximum extent allowed by law, and that a joint and several judgment in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from

adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.    Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action as provided for by law or allowed in equity;

F.    Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

G.    Plaintiffs and the members of the Class have such other and further relief as necessary to correct the anticompetitive market effects caused by Defendants' unlawful conduct, and as the Court deems just.

## XI.    JURY DEMAND

Pursuant to Fed. Civ. P. 38(b), and on behalf of itself and the proposed Class, Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: _____ July 21,2014 _____

**BARTIMUS, FRICKLETON, ROBERTSON & GOZA, P.C.**


By: _____ **/s/ James P. Frickleton** _____
    **James P. Frickleton, KS Bar #20602**
    **Edward D. Robertson, III, KS Bar #23028**

    **11150 Overbrook Road, Suite 200**
    **Leawood, KS 66211**
    **(913) 266-2300 Tel**
    **(913) 266-2366 Fax**
    **www.bflawfirm.com**
    **jimf@bflawfirm.com**
    **krobertson@bflawfirm.com**

and

W. Joseph Bruckner (pro hac vice pending)
 MN Bar No. 147758
Heidi M. Silton (pro hac vice pending)
 MN Bar No. 24759X
Kate M. Baxter-Kauf (pro hac vice pending)
 MN bar No. 392037
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
wjbruckner@locklaw.com
hmsilton@locklaw.com
kmbaxter-kauf@locklaw.com

and

Bruce L. Simon (pro hac vice pending)
 CA Bar No. 96241
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery, Suite 2450
San Francisco, CA 94104
Tel: (415) 400-7700
Fax: (415) 433-9008
bsimon@pswlaw.com

and

Michael H. Pearson (pro hac vice pending)
 CA Bar No. 277857
Bobby Pouya (pro hac vice pending)
 CA Bar No. 245527
PEARSON, SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Tel: (818) 205-2803
Fax: (818) 788-8104
mpearson@pswlaw.com
bpouya@pswlaw.com

and

Steven A. Hart (pro hac vice pending)
 IL Bar No. 6211008
SEGAL MCCAMBRIDGE SINGER &
MAHONEY
233 S. Wacker Drive, Suite 5500
Chicago, IL 60606
Tel:  (312) 645-7903
Fax:  (312) 645-7711
SHart@SMSM.com

***ATTORNEYS FOR PLAINTIFF CEFO
ENTERPRISE CORP.***

**Pursuant to Local Rule 83.5.4 admission
motions to be filed.**